UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.

COMMODITIES & MINERALS
ENTERPRISE LTD., a company incorporated
under the laws of the British Virgin Islands,

     Petitioner,

v.

CVG FERROMINERA ORINOCO, C.A.,

     Respondent.

_____/

**PETITION TO CONFIRM AND ENFORCE
INTERNATIONAL ARBITRATION PARTIAL FINAL AWARD**

Petitioner Commodities & Minerals Enterprise Ltd. ("CME") moves to confirm and enforce the international arbitration partial final award entered in its favor on January 5, 2017 (the "Partial Final Award"), against Respondent CVG Ferrominera Orinoco, C.A. ("FMO"). This Petition should be granted for the reasons set forth below.

**Introduction**

This action is a summary procedure to confirm an international arbitration award.

CME has obtained a partial final award in an international commercial arbitration dated January 5, 2017 (the "Partial Final Award"). Declaration of Michael J. Frevola dated January 17, 2017 ("Frevola Decl."), ¶ 2 & Ex. 1.[1]   The Partial Final Award directs FMO to post over $62 million dollars as security for one of CME's claims in that arbitration. As set forth more fully

---

[1] Exhibit 1 to the Frevola Declaration is a true and correct copy of the Partial Final Award dated January 5, 2017. Counsel for CME has an original signed version of the Partial Final Award in its files and will produce it to the Court for the Court's inspection at the Court's request.

below, that arbitration was commenced pursuant to an international agreement entered into between the parties, which agreement contained a mandatory arbitration clause calling for arbitration in Miami, Florida pursuant to the rules of the Society of Maritime Arbitrators, Inc. ("SMA").  The Partial Final Award is final and enforceable pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "New York Convention") and Chapter Two of the Federal Arbitration Act, 9 U.S.C. §§ 201 *et seq*. (the "FAA").

In accordance with the express mandate of Congress and the obligations assumed by the United States under the New York Convention, this Court must enforce the Partial Final Award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  9 U.S.C. § 207.  The grounds specified in the New York Convention for refusing recognition and enforcement of an award are extremely limited.

No basis exists to block enforcement of the Partial Final Award, and it should be confirmed summarily.

## The Parties

Petitioner CME is in the business of trading commodities and minerals, particularly iron ore.  CME is a company organized and existing under the laws of the British Virgin Islands since September 1, 2005.[2]

Respondent FMO is a company organized and existing under the laws of the Bolivarian Republic of Venezuela.

---

[2]  Prior to its corporate institution in the British Virgin Islands, a corporate predecessor to CME – named "CME Commodities and Minerals Enterprise Ltd." – did business as a Swiss corporate entity.

### Jurisdiction and Venue

This Court has subject matter jurisdiction over this action pursuant to federal question jurisdiction, 28 U.S.C. § 1331, under Chapter 2 of the FAA implementing the New York Convention, 9 U.S.C. §§ 201 *et seq.*  In particular, 9 U.S.C. § 203 provides that an action or proceeding "falling under the [New York] Convention shall be deemed to arise under the laws and treaties of the United States [and] [t]he district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."  *See also Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte Gmbh*, 141 F.3d 1434, 1441 (11th Cir. 1998).

This Court has *in personam* jurisdiction over Respondent FMO as a result of FMO's contractual agreement to arbitrate disputes under the parties' agreement in Miami, Florida.  Fla. Stat. Ann. § 684.0049 (West 2016).

Because the arbitration is seated in Miami, Florida, pursuant to the parties' arbitration agreement, venue in this action properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2) and 9 U.S.C. § 204 ("a[n] action or proceeding over which the district courts have jurisdiction pursuant to section 203 of this title may be brought in any such court . . . in such court for the district and division which embraces the place designated in the agreement as the place of arbitration").

### BACKGROUND

**A.     *The Underlying Contractual Relationship Between the Parties***

The underlying dispute arises out of a group of contracts between CME and FMO, all of which relate to CME's provision of financing, equipment, and services to FMO in connection with FMO's iron ore mining and sales operations in the Guayana region of Venezuela.  Frevola Decl.,

¶ 3 & Ex. 2.[3]  Initially, in 2004, CME entered into a contract with FMO for the sale and purchase of Venezuelan iron ore (the "2004 Iron Ore Sales Contract"), whereby FMO agreed to sell to CME certain quantities of various iron ore products.  Partial Final Award, ¶ 17.  Under that contract, FMO was to deliver iron ore to CME at Puerto Ordaz, at an offshore transfer station permanently moored off shore near the mouth of the Orinoco River (the "Transfer Station"), or by transshipment in Venezuelan waters, at which point the iron ore would be loaded on board ships for delivery to CME's customers.  *Id.*  FMO, however, suffered severe cash flow problems, affecting operations, including its production capacity.  NY Rule B Compl., ¶ 16.

As a result of FMO's cash flow problems, CME worked with FMO and adapted its business operations so that CME would supply FMO with financing, goods, services, and works required by FMO under a barter arrangement (i.e., CME would provide equipment and services to FMO in exchange for iron ore products).  *Id.* ¶ 17.  During this period when FMO and CME were performing under the 2004 Iron Ore Sales Contract, CME and the Venezuelan government became interested in re-opening an inactive iron ore mine named Cerro Bolivar.  *Id.* ¶ 28.  In January 2009, CME entered into an agreement with FMO's parent corporation, the Venezuelan Corporation of Guayana ("CVG") whereby both parties agreed to undertake certain activities necessary to reactivate production from the Cerro Bolivar mine (the "Framework Agreement").  *Id.* ¶ 30.

Under the terms of the Framework Agreement, in return for CME's investment to reopen the Cerro Bolivar mine, CVG guaranteed that CME would receive from FMO up to three million

---

[3] Exhibit 2 to the Frevola Declaration is a true and correct copy of the Verified Complaint filed by CME against FMO in the United States District Court for the Southern District of New York (the "NY Rule B Compl.") in a proceeding captioned *Commodities & Minerals Enterprise Ltd. v. CVG Ferrominera Orinoco, C.A.*, 1:16-cv-00861-ALC (S.D.N.Y.) (the "New York Rule B Proceeding").  The New York Rule B Proceeding is an ancillary maritime attachment proceeding pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure filed by CME in an effort to obtain security for CME's maritime claims, which collectively amount to more than $250,000,000.  *See, e.g.*, NY Rule B Compl., ¶ 91 (reciting collective maritime claim amount as $256,675,010.74).

metric tons of iron ore per year for each year of the Framework Agreement's ten-year term, or a total of thirty million metric tons of iron ore.  Partial Final Award, ¶ 18.  The terms of the Framework Agreement also contemplated that CME and FMO were to enter into separate "development contracts" whereby CME would supply financing, goods, services, and works required to support FMO's operations.  *See id.* ¶ 21.

After entering into the Framework agreement with CVG, CME then entered into a number of development contracts with FMO.  *See id.*; *see also* NY Rule B Compl., ¶ 2.  Under these development contracts, CME agreed to provide an extensive list of services to FMO, including:

(a)     Organizing, managing and operating FMO's Transfer System, which was the logistics system by which iron ore was transported from FMO's mines nearly 180 miles up the Orinoco River to the "Transfer Station" offshore Venezuela and onwards to international markets, and which services were provided under the Transfer System Management Contract (the "TSMC");[4]

(b)     Providing shuttle vessels for the maritime transportation portion of the Transfer System; and

(c)     Supplying numerous goods and supplies to FMO to upgrade and modernize FMO's iron ore operations.

*Id.*  Consistent with the spirit of the Framework Agreement, while FMO's payment obligation under the development contracts (including the TSMC) was in U.S. Dollars, CME agreed to accept

---

[4] For a detailed description of the Transfer System, and CME's responsibilities for operating the Transfer System under the TSMC, *see* NY Rule B Compl., ¶¶ 18-22.

iron ore products from FMO at agreed U.S. Dollar values per metric ton as substitute payment for funds owed under its various contracts with FMO, including the TSMC.  NY Rule B Compl., ¶ 3.

In December 2010, CME and FMO entered into a Commercial Alliance Agreement (the "CAA").  Partial Final Award, ¶ 21; NY Rule B Compl., ¶ 37.  The CAA was intended to complement the provisions of the Framework Agreement, and set forth certain terms and procedures with which each development contract would have to conform, including the development contracts into which CME and FMO already had executed (such as the TSMC).  NY Rule B Compl., ¶¶ 37-38.

**B.**     *FMO's Breach of the TSMC*

As demonstrated above, the contractual relationship between CME and FMO involved many interrelated, but independent contracts.  NY Rule B Compl., ¶ 42.  In general, however, the parties' relationship evolved into an alliance whereby CME would provide various forms of financing, goods, and services for the cash-poor FMO, in return for which CME would receive a predetermined U.S. Dollar cash equivalent in iron ore products.  Partial Final Award, ¶ 24.  CME would invoice FMO for services it provided under the various contracts (including the TSMC), and FMO would invoice CME for the iron ore products provided to CME.  *Id.*  Had the alliance worked as contemplated, the total amount of CME's invoices owed by FMO would equal the total amount of FMO's invoices owed by CME.  *Id.*

The amount of CME's invoices to FMO, however, always exceeded the amount of FMO's invoices to CME.  NY Rule B Compl., ¶¶ 42-47.  In August 2011, the parties participated in a reconciliation of their accounts through December 2010, the result of which showed an outstanding final balance of over $1.5 million owed by FMO to CME.  Partial Final Award, ¶ 28.  From 2011

6

onwards, however, FMO increasingly was in CME's debt.  NY Rule B Compl., ¶ 46.  The majority

of CME's outstanding invoices are for amounts owed to CME by FMO under the TSMC.  *Id.*

The situation worsened significantly in March 2013 after the death of Venezuelan President

Hugo Chavez, following which there was considerable unrest and uncertainty in the Venezuelan

government and economy.  Partial Final Award, ¶ 30.  In order to address the extraordinary

economic difficulties facing the Venezuelan government, President Maduro sought means by

which Venezuelan state-owned companies and their subsidiaries could avoid or lessen their

financial commitments to non-government entities and, in particular, foreign entities like CME.

*Id.*  As part of a broad plan to implement this policy, in 2013 FMO's parent company, CVG, which

corporation is wholly-owned by the Venezuelan government, appointed as president of FMO a

high ranking, active duty Venezuelan military officer, General Jesus Manual Zambrano Mata.  *Id.*

CME attempted to open a dialogue with FMO's new management regarding the amount of

its outstanding claims, but FMO seemed intent on retroactively rewriting the terms of its

agreements with CME, including the TSMC.  *Id.*  When CME rejected FMO's new terms, FMO

took the position that all of CME's contracts violated Venezuelan law and stopped supplying iron

ore to CME altogether.  *Id.*  As a result of FMO's actions, the financial imbalance between CME

and FMO worsened at an accelerated rate as CME continued performing under its various contracts

with FMO, but no longer was receiving iron ore.  *See* NY Rule B Compl. ¶¶ 49-50.

In response to FMO's allegations that CME's contracts were illegal, CME commenced a

declaratory action against FMO in Venezuela in August 2013 seeking a declaratory judgment that

CME's contracts with FMO did not violate Venezuelan law.  Partial Final Award, ¶ 31.  In

retaliation, and to further discredit CME, following the commencement of the Venezuelan

declaratory proceeding FMO made criminal accusations against the directors and management of

CME in Venezuela.  *Id.* ¶ 32.  Further legal and administrative proceedings followed in Venezuela involving CME and FMO from 2013 through 2015, but ultimately the Venezuelan court determined in August 2015 that CME's contracts with FMO "were executed in compliance with [Venezuelan laws]."  *Id.* ¶¶ 31-35.  Following that decision from the Venezuelan court, CME began to take measures to pursue its claims against FMO pursuant to the arbitration clauses in its various development contracts, including the TSMC.  Overall, by the end of 2015, the net amount of CME's claims against FMO amounted to well over $250,000,000.  *Id.* ¶ 29.

**C.**     ***The New York Rule B Proceeding***

On February 4, 2016, CME commenced the New York Rule B Proceeding (*see* footnote 3 *infra*) against FMO seeking, amongst other things, a Rule B maritime attachment in aid of arbitration.  *See generally* NY Rule B Compl.  That proceeding currently is pending before the Honorable Andrew L. Carter, Jr.  In the New York Rule B Proceeding, CME sought a maritime attachment to secure the claims that CME was commencing against FMO in several arbitrations under certain of its development contracts that are considered maritime contracts under U.S. Law. NY Rule B Compl., ¶¶ 87-94.  The contracts include several vessel charter party agreements which contain London arbitration clauses (the "English Charters"), a vessel charter party agreement which contains a New York arbitration clause (the "*GENERAL PIAR* Charter"), and the TSMC, which contains a Miami arbitration clause (collectively, the "Maritime Contracts").  *Id.*  With regard to CME's claims under the Maritime Contracts, Judge Carter issued an order of maritime attachment in favor of CME in the collective amount of over $250,000,000 (the "Rule B Attachment Order"), the majority of which pertained to CME's claims under the TSMC.  *See* NY Rule B Compl., ¶64 (claiming $212,262,096.46 owing under the TSMC alone).  Pursuant to the

Rule B Attachment Order, CME has attached approximately $7.5 million in FMO's New York bank account, which funds remain under attachment.  Frevola Decl., ¶ 6.

FMO has moved to vacate the Rule B Attachment Order, principally on the grounds that FMO's property in New York is immune to pre-judgment attachment under the Foreign Sovereign Immunity Act ("FSIA").  *Id.* ¶ 7.  FMO's motion to vacate has been fully briefed and remains pending before Judge Carter as of the date of this filing.  *Id.* ¶ 7.

In February 2016, shortly after commencing the New York Rule B Proceeding, CME commenced arbitration under each of the Maritime Contracts in London (for the English Charters), New York (for the *GENERAL PIAR* Charter), and Miami (for the TSMC).  *Id.* ¶ 8.

**D.**   ***The TSMC Arbitration***

On February 9, 2016, CME commenced arbitration against FMO for its claims arising under the TSMC, which contract provides for arbitration in Miami in accordance with the SMA Rules (the "TSMC Arbitration").  Partial Final Award, ¶ 5.  Specifically, the TSMC arbitration clause provides:

> The Parties hereby expressly declare their Contract to submit to binding arbitration any and all controversies arising from, or in any way related to, this Contract and/or the execution and/or interpretation thereof, including, but not limited to, the validity and/or enforceability of this clause; and consequently further expressly waive their right to submit any such controversies to the jurisdiction of the Courts of any State/Country, including expressly, but not limited to, the jurisdiction of the Venezuelan Courts, as allowed by the Venezuelan Commercial Arbitration Act and any other applicable Venezuelan laws.  The parties further declare that this Contract has been negotiated at arm's length and in no way may be construed as a contract of adhesion for neither of them.  Should a controversy arise that, by virtue of any applicable legislation, may not be submitted to arbitration, then only that controversy, and no other, may be submitted to the Courts having jurisdiction.

> Arbitration shall be conducted in Miami, Florida, in accordance with the Rules of the Society of Maritime Arbitrators then in force, in the English language.  The arbitration shall be exclusive and mandatory.  The following procedure shall be followed for the appointment of arbitrators:

#49301733_v1

(i) The arbitration panel shall consist of three arbitrators, one to be appointed by each of the parties hereto and the third by the two so chosen. The Arbitrators shall be experienced in both commercial and maritime law. Either party may initiate the arbitration as provided in the Rules of the Society of Maritime Arbitrators. The Arbitrators shall apply the General Maritime Law of the United States of America as the substantive law.

Their decision shall be final and binding for the parties as though it were the final and unappealable decision of a Court of competent jurisdiction. The Arbitration Panel shall have the authority to order any and all preventive measure as it deems fit, and either party shall be entitled to present such order to any competent Court for its enforcement. The Arbitrators shall also have the authority to certify copies of any and all documents submitted to them and/or orders issued by them. The award shall be reasoned and shall set forth findings of fact and conclusions of law. The award shall include interest at the prime rate of interest announced publicly by the *Wall Street Journal* (or its successors) as the so-called "prime rate."

The prevailing party shall recover all attorney's fees and costs from the other party.

TSMC, Clause 41 (*see* Frevola Decl., Ex. 3, Clause 41).[5]

On the same day that CME commenced the TSMC Arbitration, CME also commenced arbitration against FMO for its claims arising under the *GENERAL PIAR* Charter, which charter provides for arbitration in New York in accordance with the SMA Rules (the "*GENERAL PIAR* Charter Arbitration"). Partial Final Award, ¶ 5. The parties selected the same arbitrators in both proceedings, which arbitrators selected the same chairman for both proceedings. *Id.* The parties have confirmed their acceptance of the arbitration panels, and thus the same arbitrators are presiding over both the TSMC Arbitration and the *GENERAL PIAR* Charter Arbitration. *Id.* The two arbitrations have not been consolidated, but the parties agreed to hold consolidated hearings in New York. *Id.* ¶ 2. This petition, however, concerns only the Partial Final Award as it pertains to the TSMC Arbitration (i.e., the Miami-seated arbitration).

---

[5] A true and correct copy of the TSMC is annexed to the Frevola Declaration as Exhibit 3.

CME asserted claims in the TSMC Arbitration for breach of contract and account stated, and seeks an award in the aggregate amount of over $227 million. *Id.* ¶ 29.  CME also sought a partial final security award for certain portions of its claim, including security in the amount of $51,104,097.17 for monthly payments for throughput charges that were due to CME under the TSMC, which payments were to made by FMO to CME with no right of deduction or setoff (the "Throughput Claims").  *Id.* ¶¶ 47 – 51.  CME's security motion was fully briefed by both parties, and hearings were held on CME's motion in October and November 2016, which hearings were attended by both parties.  *Id.* ¶ 7.[6]

FMO also made a preliminary motion to dismiss the TSMC Arbitration on the grounds that the panel lacked jurisdiction to hear CME's claims.  *Id.* ¶ 3.  FMO's motion to dismiss also was fully briefed by the parties, and was argued at the October and November hearings.  *Id.* ¶ 7.

As of the date of this filing, no hearings have taken place in the TSMC Arbitration with regard to CME's substantive claims.

**E.**     ***The Partial Final Award***

The arbitrators in the TSMC Arbitration issued the Partial Final Award on January 5, 2017. The Partial Final Award addresses CME's motion for security and FMO's motions to dismiss in both the TSMC Arbitration and the *GENERAL PIAR* Charter Arbitration.  Pertinent to this petition, the Partial Final Award awards CME security in the amount of $62,730,279.98 for its Throughput Claims arising under the TSMC.  *See id.* ¶¶ 37-60.

The Panel held that it had the authority to order FMO to post security pursuant to SMA Rule 30, and pursuant to the TSMC's arbitration clause, which clause gives the Panel the authority

---

[6] CME also made a motion for a partial final security award in the *GENERAL PIAR* Charter Arbitration, which motion also was argued during the October and November hearings.  Partial Final Award, ¶ 7.  That motion, however, is not relevant to this petition.

to grant any remedy or relief which it deems just and equitable. *Id.* ¶¶ 41-44. The TSMC Arbitration panel held that security was justified, notwithstanding FMO's potential substantive defenses or counterclaims, because under the TSMC FMO was obligated to make the throughput payments without any right of deduction or offset. *Id.* ¶¶ 50-52. The TSMC Arbitration panel found that CME had made an adequate showing that it is likely to prevail on the merits with respect to its Throughput Claims in the amount of $51,104,097.75, plus interest. *Id.* ¶ 56. The panel further held that FMO had not made a convincing showing that it has viable grounds for disputing CME's invoices for the Throughput Claims. *Id.* The panel also recognized the difficulty CME is likely to face in enforcing an eventual final award and the considerable financial hardship CME would encounter if the award cannot be enforced, which weighed heavily in favor of awarding pre-judgment security. *Id.* ¶ 57.

FMO had raised a number of arguments in opposition to CME's security motion, including arguing that FMO was immune from pre-judgment attachment in arbitration under the FSIA, but the Panel rejected FMO's arguments. *See id.* ¶¶ 46-55. Specifically, with regard to FMO's FSIA argument, the Panel held that the FSIA does not apply in arbitration and does not bar an arbitration panel from ordering an agency of a foreign sovereign to post pre-judgment security. *Id.* ¶ 53.

The Final Partial Award orders FMO to make a deposit in the amount of $62,730,279.98 (the amount of the Throughput Claims plus accrued interest at 3.25%) in an escrow account to be established by the parties and held by a first-class New York bank. *Id.* ¶ 72. As of the date of this petition, FMO has not yet posted the required security. Frevola Decl., ¶ 9.

**ARGUMENT**

**A.**   ***The Court Should Confirm and Enforce the Partial Final Award***

The Partial Final Award was issued in an international commercial arbitration governed

by the New York Convention and Chapter Two of the FAA.  Section 207 of the FAA provides:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration.  The court ***shall*** confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

9 U.S.C. § 207 (emphasis added); New York Convention, Art. III ("[e]ach Contracting State ***shall***

recognize arbitral awards as binding and enforce them in accordance with the rules of procedure

of the territory where the award is relied upon") (emphasis added); *see Lindo v. NCL (Bahamas),*

*Ltd.*, 652 F.3d 1257, 1262 (11th Cir. 2011) ("[t]he goal of the convention, and the principal purpose

underlying American adoption and implementation of it, was to encourage the recognition and

enforcement of commercial arbitration agreements in international contracts and to unify the

standards by which agreements to arbitrate are observed and arbitral awards are enforced in the

signatory countries") (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974)).

The Partial Final Award clearly falls under the terms of the New York Convention.  In

implementing the Convention, Congress defined agreements or awards falling under the

Convention as those "arising out of a legal relationship, whether contractual or not, which is

considered as commercial, including a transaction, contract, or agreement described in section 2

of this title [i.e., maritime transactions or transactions involving commerce]."  9 U.S.C. § 202.

Here, the Partial Final Award and underlying agreement (the TSMC) satisfies the definition of

awards falling under the Convention.

13

Moreover, Article I(1) of the New York Convention provides that the Convention applies "to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought." The Partial Final Award also is subject to enforcement under the New York Convention because it involves a non-domestic award; i.e., an award between parties domiciled or having their principal place of business outside of the U.S.:

> We join the First, Second, Seventh, and Ninth Circuits in holding that arbitration agreements and awards "not considered as domestic" in the United States are those agreements and awards
>
>> which are subject to the Convention not because [they were] made abroad, but because [they were] made within the legal framework of another country, e.g., pronounced in accordance with foreign law *or involving parties domiciled or having their principal place of business outside the enforcing jurisdiction*. We prefer this broad[ ] construction because it is more in line with the intended purpose of the treaty, which was entered into to encourage the recognition and enforcement of international arbitration awards.

*Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1441 (11th Cir. 1998) (quoting *Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2d Cir. 1983) (internal citation omitted)) (emphasis in original).

Here, both CME and FMO are foreign corporations from countries that are signatories to the New York Convention.[7] *See Rhone Mediterranee Compagnia Francese Di Assicurazioni E Riassicurazoni v. Achille Lauro*, 712 F.2d 50, 52 (3d Cir. 1983) (when all parties to time charter agreement and lawsuit were Italian, and Italy and United States were both parties to the New York Convention, arbitration clause fell within Convention's coverage).

---

[7] An updated list of countries that are signatories to the New York Convention is available at http://www.newyorkconvention.org/list+of+contracting+states.

B.     *Standard of Review for Confirmation of International Arbitration Awards Under the New York Convention*

The New York Convention provides that covered awards must be enforced, except on very specific and limited grounds: "Section 207 provides that confirmation is mandatory 'unless . . . [a court] finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention." *Am. Life Ins. Co. v. Parra*, 269 F. Supp. 2d 519, 524 (D. Del. 2003);[8] *accord Imperial Ethiopian Gov't v. Baruch-Foster Corp.*, 535 F.2d 334, 336 (5th Cir. 1976).

Proceedings to enforce foreign arbitral awards under Section 207 are summary in nature. *Empresa De Telecommunicaciones De Bogota S.A. E.S.P. v. Mercury Telco Group, Inc.*, 670 F. Supp. 2d 1357, 1361 (S.D. Fla. 2009). Such proceedings are "not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation[ ] or grounds for refusal to confirm." *Chelsea Football Club Ltd. v. Mutu*, 10-cv-24028, 2012 WL 463932 (S.D. Fla. Feb. 13, 2012) (confirming award of Court of Arbitration for Sport seated in Switzerland in favor of Chelsea Football Club) (quoting *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007) (citation omitted)).

"[T]he showing required to avoid summary confirmation is high," *Ottley v. Schwarzberg*, 819 F.2d 373, 376 (2d Cir. 1987), and the burden of establishing the requisite factual predicate to deny confirmation of an arbitral award rests with the party resisting confirmation. *Imperial Ethiopian*, 535 F.2d at 336; *Empresa De Telecommunicaciones*, 670 F. Supp. 2d at 1361; *see also* New York Convention, Art. V ("Recognition and enforcement of the award may be refused, at the

---

[8] While the *Parra* court was construing the Panama Convention in its decision, it cited to Section 207 of the New York Convention as the mechanism by which Panama Convention awards are recognized in the United States. *See Parra*, 269 F. Supp. 2d at 524.

request of *the party against whom it is invoked, only if __that__ party furnishes [proof]* to the competent authority where the recognition and enforcement is sought . . . .") (emphasis added).

The principal purpose underlying the New York Convention is "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which . . . arbitral awards are enforced in the signatory countries." *Scherk*, 417 U.S. 506, 520 n. 15 (1974). In accordance with this principal purpose, an international arbitration award under the New York Convention is "subject only to minimal standards of domestic judicial review." *Indus. Risk*, 141 F.3d at 1440 (citation omitted); *Costa v. Celebrity Cruises, Inc.*, 768 F. Supp. 2d 1237, 1240-41 (S.D. Fla. 2011) (refusing to vacate award on public policy grounds under New York Convention) (citing *Indus. Risk*, 141 F.3d at 1445-46); *see also Fla. Power Corp. v. Int'l Broth. of Elec. Workers*, 847 F.2d 680, 682-83 (11th Cir. 1998) (reversing district court that had exceeded limited authority to review domestic arbitral award). Any additional grounds for vacating an arbitration award as may be contained in Chapter One of the FAA – which entails a lower burden requiring a showing of "evident partiality" – are strictly inapplicable. *See id.* ("In short, the [New York] Convention's enumeration of defenses is exclusive"). Review of the findings of the panel's decision likewise is highly circumscribed:

> "[a]bsent extraordinary circumstances, a confirmation court is not to reconsider the arbitrator's findings." *Europcar Italia v. Maiellano Tours*, 156 F.3d 310, 315 (2d Cir. 1998). A mistake in fact or law is insufficient to refuse confirmation of an arbitral award. *Id.* at 316.

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 190 F. Supp. 2d 936, 943 (S.D. Tex. 2001), *aff'd*, 364 F.3d 274 (5th Cir. 2004).

Respondents bear both the burden of proof and the burden of persuasion to make a convincing showing that one of the limited grounds for not enforcing the Award applies. *See Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie Du Papier (RAKTA)*, 508

F.2d 969, 973 (2d Cir. 1974) (party seeking to vacate an arbitration award bears the burden of proof to set forth specific grounds for doing so); *TMR Energy Ltd. v. State Prop. Fund*, 411 F.3d 296 (D.C. Cir. 2005) (the New York Convention "assigns the burden of persuasion to the party opposing enforcement") (citing *Indus. Risk*, 141 F.3d at 1441-42).

Moreover, "[d]efenses to enforcement under the New York Convention are construed narrowly, 'to encourage the recognition and enforcement of commercial arbitration agreements in international contracts,'" *Karaha Bodas Co.*, 364 F.3d at 288 (quoting *Imperial Ethiopian*, 535 F.2d at 335), and "this Court's review of the award thus is extremely limited." *Rintin Corp. v. Domar, Ltd.*, 374 F. Supp. 2d 1165, 1169 (S.D. Fla. 2005) (citation omitted), *aff'd*, 476 F.3d 1254 (11th Cir. 2007). "This is particularly true in the context of international arbitrations, in which context there is a 'general pro-enforcement bias.'" *Id.* (citation omitted). Indeed, "[a]bsent 'a convincing showing' that one of these narrow exceptions [under Article V of the New York Convention] applies the arbitral award will be confirmed." *In re Arbitration Between Trans Chem. Ltd. and China Nat'l Mach. Import & Exp. Corp.*, 978 F. Supp. 266, 309 (S.D. Tex. 1997) (citations omitted).

**C.**     ***None of the Specified Grounds Exist for Refusal or Deferral of Confirmation Under the New York Convention***

Under the New York Convention, there are only two substantive grounds on which a court may refuse to enforce an award: (1) if "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of the country;" or (2) if the "recognition or enforcement of the award would be contrary to the public policy of that country." New York Convention, Art. V(2). Neither exception is applicable here.

There is no question that the parties' dispute – concerning breach of a commercial agreement for CME to provide marine transportation logistics services to FMO – is "capable of

settlement by arbitration" under U.S. law.  U.S. law strongly encourages arbitration of commercial disputes and the recognition of resulting awards.  *See*, *e.g.*, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 615 (1985) (noting strong "federal policy in favor of arbitral dispute resolution, a policy that applies with special force in the field of international commerce"); *Olsher Metals Corp. v. Olsher*, No. 03-12184, 2004 WL 5394012, * 2 (11th Cir. Jan. 26, 2004) ("[t]he Federal Arbitration Act evinces a 'liberal federal policy favoring arbitration agreements[ ],' and this presumption in favor o[f] arbitration 'applies with special force in the field of international commerce'") (internal citations omitted).

Similarly, there is no question that the public policy exception is inapplicable.  For the "public policy" exception to apply under the New York Convention, FMO must make a convincing showing that a defect in the Partial Final Award was so severe and pervasive that it "would violate the forum state's most basic notions of morality and justice."  *Costa v. Celebrity Cruises, Inc.*, 768 F. Supp. 2d 1237, 1240-41 (S.D. Fla. 2011).  The public policy exception is reserved for the most extreme circumstances:

> The public policy defense is to be "construed narrowly to be applied only where enforcement would violate the forum state's most basic notions of morality and justice."  "The general pro-enforcement bias informing the convention . . . points to a narrow reading of the public policy defense."

*Karaha Bodas Co.,* 364 F.3d at 306 (citations omitted).

The New York Convention also allows a court to refuse enforcement if the party against which enforcement is sought raises one of the following procedural objections: incapacity of the contracting parties or invalidity of the arbitration agreement; failure of notice; inapplicability of the arbitration agreement to the particular dispute being arbitrated; irregularity in the formation of the arbitral tribunal; or that the award is not yet binding or has been set aside or superseded by a competent authority.  New York Convention, Art. V(1).

#49301733_v1

None of those procedural grounds applies here and, in any event, the burden is upon the party resisting enforcement to prove the existence of such grounds:

> The proponent of the award is required only to supply the original or a certified copy of the award and the arbitral agreement. These establish a *prima facie* case, and the burden shifts to the defendant to establish the invalidity of the award on one of the grounds specified in Article V 1.

*Czarina L.L.C. v. WF Poe Syndicate*, 358 F.3d 1286, 1292 n.3 (11th Cir. 2004) (citation omitted); *see also Four Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.*, 613 F. Supp. 2d 1362, 1367, 1370 (S.D. Fla. 2009) (party resisting enforcement failed to meet burden under Article V(1); "[t]here is a 'general pro-enforcement bias' manifested in the [New York] Convention").

Moreover, federal courts, including the Eleventh Circuit, have rejected frivolous arguments opposing confirmation of arbitration awards. *See B.L. Harbert Int'l, LLC v. Hercules Steel Co.*, 441 F.3d 905, 913-14 (11th Cir. 2006) (upholding confirmation of arbitration award and considering sanctions for frivolous arguments opposing confirmation); *see also DMA Int'l, Inc., v. Qwest Comms. Int'l Inc.*, 585 F.3d 1341, 1346 (10th Cir. 2009) (ordering lawyers for losing party to pay the prevailing party's attorneys' fees as sanctions for appealing the confirmation of an arbitral award without sufficient grounds).

CME therefore is entitled to immediate confirmation and enforcement of the Partial Final Award under the New York Convention and respectfully requests that the Court enter judgment accordingly.

## Conclusion

The grounds for a court to refuse to confirm an international arbitration award under the New York Convention are extremely narrow and the burden of proof is extremely high. None of the grounds to refuse confirmation exist here, in any event, and the Partial Final Award should be confirmed expeditiously.

CME therefore requests that this Court enter a judgment:

(1)     Confirming and enforcing the Partial Final Award rendered against FMO pursuant to the New York Convention and 9 U.S.C. § 201 *et seq.*;

(2)     Ordering FMO to make a deposit in the amount of $62,730,279.98 in an escrow account to be established by the parties and held by a first-class New York bank which shall act as escrow agent and must irrevocably agree to abide by the orders of the Panel in the TSMC Arbitration concerning payment of the funds so held.  The Panel in the TSMC shall designate an independent escrow agent in the absence of agreement between CME and FMO.

(3)     Retaining jurisdiction to enforce satisfaction of the judgment as may be necessary.


Dated:  January 17, 2017.

Respectfully submitted,

HOLLAND & KNIGHT LLP

By:____/s/ Brian A. Briz_____
Brian A. Briz
Florida Bar No. 657557
Holland & Knight LLP
701 Brickell Avenue, Suite 3300
Miami, Florida   33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799
E-mail: brian.briz@hklaw.com

#49301733_v1